STATE OF NORTH CAROLINA v. IMANI KABRON PARKER, Defendant

No. COA98-1557

(Filed 2 May 2000)

## 1. Search and Seizure— investigatory stop—reasonable articulable suspicion

The trial court did not err in a trafficking in cocaine case by denying defendant's motion to suppress items seized during the search of her automobile, because the detectives had a reasonable articulable suspicion to conduct an investigatory stop of defendant's vehicle since: (1) the cumulation of information received by the detectives throughout their investigation led them to believe a "stash house" for drugs was located at 206 Wind Road; (2) within minutes of setting up surveillance of that location, at approximately 1:00 a.m., the detectives observed two men and defendant exit the complex and walk hurriedly to a parked vehicle in the parking lot; (3) the detectives noticed the men placing what appeared to be a rifle wrapped in a blanket and a black tote bag, possibly containing controlled substances, in the trunk of the automobile; and (4) the time of day, the detectives' experience, and the detectives' prior knowledge of the propensity of the area for criminal conduct revealed that it was not unreasonable to infer that the occupant of the vehicle engaged in some sort of criminal activity.

## 2. Sentencing— consecutive terms—not cruel and unusual

The trial court did not err by imposing consecutive sentences in a trafficking in cocaine by transportation and conspiracy to traffick in cocaine case because: (1) although defendant cites the Eighth Amendment prohibition against cruel and unusual punishment in her appellate brief, it was not a basis of defendant's assignment of error challenging the sentence imposed, N.C. R. App. P. 10(a); (2) defendant has cited no authority or court decision requiring a trial court to apportion strict degrees of culpability among codefendants when imposing a sentence, N.C. R. App. P. 28(b)(5); (3) the Eighth Amendment does not require strict proportionality between the crime and the sentence; (4) the sentences imposed upon defendant were within the presumptive statutory range authorized for her drug trafficking offenses under the Structured Sentencing Act, N.C.G.S. § 90-95(h)(3)(b); (5) the Eighth Amendment is not offended by variance in sen-

**STATE v. PARKER**

[137 N.C. App. 590 (2000)]

tence terms among codefendants where some have pleaded guilty and others were convicted by a jury; and (6) the statements of one trial judge, indicating it would be a perversion of justice for this defendant to get a larger sentence than her more culpable codefendants, were made prior to the plea arrangements of her codefendants.

Appeal by defendant from orders entered 11 March 1997 by Judge Howard R. Greeson, Jr., and 9 December 1996 by Judge W. Douglas Albright, and from judgments entered 8 January 1997 by Judge James M. Webb in Guilford County Superior Court. Heard in the Court of Appeals 22 September 1999.

*Attorney General Michael F. Easley, by Assistant Attorney General Marc D. Bernstein, for the State.*

*Smith, James, Rowlett and Cohen, L.L.P., by Seth R. Cohen, for defendant-appellant.*

JOHN, Judge.

Defendant appeals judgments entered upon convictions by a jury of trafficking in cocaine by transportation and conspiracy to traffick in cocaine. Defendant contends the trial court erred by denying her motions to suppress and sentencing her to consecutive terms. We conclude the trial court did not err.

The State's evidence at trial tended to show the following: During August 1995, the Greensboro Police Department (the Department), learned through two confidential sources that Murad Weaver (Weaver), a suspected drug dealer, was distributing large amounts of cocaine in the Greensboro area and that he maintained an apartment on Wind Road. In February 1996, Marcus Dalton (Dalton), who had been charged with a drug trafficking offense, agreed to assist the Department in their on-going investigation of Weaver.

On 1 February 1996, Dalton telephoned Weaver to arrange a purchase of cocaine and was told to meet Weaver near Wind Road. However, because of police difficulty in monitoring the area specified by Weaver, Dalton suggested and Weaver agreed to another location. Within hours of the conversation, Weaver, accompanied by Tommie Blaylock (Blaylock), met Dalton at the arranged site and directed Dalton to follow him to another location. As the group began to depart, Detectives W.J. Graves (Graves), A.S. Wallace (Wallace), Mike

Wall (Wall) (jointly, the detectives), and several other law enforcement officers positioned nearby, intervened and stopped Weaver's automobile. A subsequent search of the vehicle revealed no contraband; nonetheless, Weaver and Blaylock were arrested and charged with conspiracy to traffick cocaine.

While in custody, Weaver indicated he lived with his sister at 2107 Windsor Street and insisted that police search the residence for controlled substances. Shortly thereafter, the detectives drove to the Windsor Street location and were greeted by Sheldon Boyce (Boyce). Boyce claimed to be a resident at the premises and consented to a search of the dwelling and of his person. Although no drugs were located, the detectives recovered a Western Union money transfer receipt from Boyce's wallet bearing the previous day's date and designating Boyce as the sender who resided at 206 Wind Road. Also discovered was an identification card displaying Blaylock's photograph, but bearing the name Markus Watlington. When asked if he knew Blaylock or Weaver, Boyce denied knowing Weaver but indicated Blaylock had a girlfriend who resided at 206 Wind Road and that Blaylock had lived with her at one time. As the detectives proceeded to leave, they acquiesced in Boyce's request to provide him with transportation to Market Street so that he could make a telephone call.

After considering the inconsistencies concerning Boyce's residence, the fictitious ID card, the receipt listing a 206 Wind Road address, and other connections linking Wind Road to possible drug activity, the detectives believed a "stash" house containing controlled substances was located on Wind Road. They further suspected Boyce intended to call his "cohorts" at 206 Wind Road to warn them of possible police surveillance in light of the detectives' interest in the money receipt containing that address.

Upon delivering Boyce to Market Street and following a brief stop at the Department, the detectives traveled to 206 Wind Road where they anticipated observing drug related activity. The detectives concealed themselves in front of the 206 Wind Road apartment complex at approximately 1:00 a.m. Within minutes, three individuals, later identified as defendant, Mark Ammonds (Ammonds) and Ronald Gooden (Gooden), exited the complex bearing various items. In defendant's hand was a brown paper shopping bag, a second individual carried what appeared to be a rifle wrapped in a blanket, and the third had a black tote bag. The group "hurried" across the parking lot to a parked automobile. The two men placed their items in the trunk

of the vehicle while defendant set the brown bag behind the driver's seat and then drove away alone. As the men returned to the apartment building, Detective Wallace observed Ammonds bend down and appear to put something behind a bush. Upon investigation, the detectives found nothing in the area and believed they had been sighted by the two men who then began "acting up" to "distract" the detectives' attention from the departing vehicle. The detectives thereupon decided to pursue defendant.

Upon stopping defendant's automobile, Wallace approached the passenger side with a flashlight. Illuminating the interior of the vehicle, he observed the shopping bag behind the driver's seat. It contained what appeared to be cocaine wrapped in clear plastic bags. Defendant was arrested and the substance, later identified as 351.4 grams of cocaine and 39.4 grams of cocaine base, was seized. Retrieved from the trunk of the automobile was the black tote bag and a SKS assault rifle wrapped in a sheet. The detectives subsequently learned defendant, Ammonds and Gooden had made arrangements to exchange the cocaine and weapon for $1,500.00 in cash to bail Weaver out of jail.

Prior to trial, defendant moved to suppress the evidence seized as a result of the vehicle stop. The motion was denied by Judge Howard R. Greeson, Jr. (Judge Greeson), and the case came on for trial during the 28 October 1996 Mixed Session of Guilford County Superior Court. A deadlocked jury resulted in a mistrial being declared 1 November 1996 and re-trial was scheduled before Judge W. Douglas Albright (Judge Albright) during the 9 December 1996 Criminal Session of Superior Court. Judge Albright denied defendant's renewed motion to suppress prior to trial. On 13 December 1996, the jury returned verdicts of guilty on charges of trafficking in more than 200 and less than 400 grams of cocaine, and conspiracy to traffick in more than 200 and less than 400 grams of cocaine. Judge Albright continued sentencing to allow for disposition of the cases against the co-defendants.

On 8 January 1997, Judge James M. Webb (Judge Webb) conducted sentencing hearings for defendant, Gooden, Ammonds and Weaver. Pursuant to a plea arrangement, Gooden and Ammonds pleaded guilty to Class G drug felonies involving less than 200 grams of cocaine and were each sentenced to a minimum of 35 and a maximum of 42 months imprisonment. Weaver also plea-bargained and pleaded guilty to Class F felonies of trafficking and conspiracy to traffick 200 to 400 grams of cocaine. He was sentenced to a minimum

of 70 and a maximum of 84 months imprisonment on each offense, the sentences to run consecutively. Defendant, who had pleaded not guilty and entered into no plea arrangement, was sentenced to two consecutive terms of 70 months to 84 months imprisonment, identical to the sentences imposed upon Weaver. Defendant appeals.

[1] Defendant first contends her motions to suppress were erroneously denied. She argues the investigatory stop of her automobile was "based on a mere hunch rather than reasonable articulable suspicion." We disagree.

In reviewing denial of a motion to suppress, this Court must determine:

> whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.

*State v. Cooke,* 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). While the trial court's factual findings are binding if sustained by the evidence, the court's conclusions based thereon are reviewable *de novo* on appeal. *State v. Mahaley,* 332 N.C. 583, 592-93, 423 S.E.2d 58, 64 (1992), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 649 (1995).

Defendant's 1 October 1996 motion to suppress evidence asserted the search of her automobile and subsequent seizure of certain items contained therein was invalid because the detectives had no "reasonable grounds" or "particularized or objective basis" to suspect defendant had committed a crime. However, in his 3 October 1996 ruling upon the motion, Judge Greeson designated numerous specific, articulable facts he determined sufficient to justify the investigatory stop, including:

> 4. [Weaver] told the officers that he lived at 2107 Windsor Street and provided the officers with consent to search that premises.
>
> 5. [The detectives] knew based upon a continuing investigation that Murad Weaver frequented an unknown address in the vicinity of Wind Road.
>
> . . . .
>
> 7. The detectives made contact at the Windsor Street address with who was later identified as [Boyce] who claimed that he resided there but did not know [Weaver].

8. [Boyce] granted consent to the officers to search the residence and his person and the officers located in his wallet a Western Union money transfer receipt listing [Boyce's] address as 206 Wind Road and a North Carolina identification card with [Blaylock's] photograph but an alias name of Marcus [sic] Watlington.

9. [Boyce] told the officers that [Blaylock's] girlfriend lived at the Wind Road address and he himself had been there recently.

. . . .

11. The officers agreed at his request to transport [Boyce] to another location so that he could make a telephone call.

12. The officers then responded immediately to the Wind Road address believing that they may locate and identify further coconspirators to the previously arranged drug transaction and further locate any contraband connected to the drug transaction.

13. The officers believed that [Boyce] may contact possible coconspirators at the Wind Road address and alert them of the officers' continuing investigation.

14. The officers arrived at the Wind Road apartment complex at or about 1:00 a.m. and positioned themselves for surveillance activities in the parking lot adjacent to 206 Wind Road.

15. 206 Wind Road is a multiple-unit dwelling.

16. Within minutes of their arrival, the officers observed three persons . . . exit building 206.

17. The three individuals were walking in a hurried fashion toward the parking lot and each was carrying separate items.

18. [Defendant] was carrying a large brown shopping-type bag and [another] . . . was carrying a hand or tote bag and the third individual was carrying what appeared to be a rifle wrapped tightly in a sheet and carried in a manner consistent with a firearm.

19. The items were placed in an automobile and [defendant] got in and began to drive away.

20. Detective Wallace had begun to follow one of the two males who walked back to the building but returned to the other offi-

cers after believing that the individual was merely attempting to distract the officers away from the vehicle.

21. The officers then followed the vehicle operated by [defendant], believing that it contained items of contraband, including a concealed rifle.

22. The officers effected a vehicle stop and . . . approached the car.

. . . .

26. Detective Wallace could observe . . . what appeared to be a large amount of compressed powder cocaine in a clear plastic packaging in the open shopping bag.

Judge Greeson's order also contained the following pertinent conclusions of law:

1. The officers were reasonable in their belief that they may further their initial investigation by responding to 206 Wind Road based upon their prior familiarity with Wind Road, the discoveries made during the course of their contact, search and interview of [Boyce], and the combined training and experience of the detectives who believed the Wind Road address represented a possible stash or storage location for the cocaine.

2. The officers were reasonable in their belief that criminal activity may have occurred or was occurring when they observed the three persons exit 206 Wind Road at 1:00 a.m. in a hurried fashion, carrying items that included what they reasonably believed to be a concealed weapon.

3. The officers had reasonable and articulable suspicion that criminal activity was afoot and were justified in stopping the vehicle operated by [defendant] for limited investigative purposes. . . .

Judge Albright denied defendant's renewal of her motion at retrial, stating

a Superior Court Judge has heretofore heard in an evidentiary hearing the motion to suppress and has entered a ruling thereon based upon findings of fact and conclusions of law. That ruling is the law of the case. There's an insufficient showing . . . that would compel a re-litigating of that entire issue.

The Fourth Amendment to the Constitution of the United States and Section 20 of Article I of the North Carolina Constitution prohibit unreasonable searches and seizures. *State v. Garner*, 331 N.C. 491, 506-07, 417 S.E.2d 502, 510 (1992). Nonetheless, it is well established that police officers may conduct a brief investigatory stop of a vehicle without probable cause when

> justified by specific, articulable facts which would lead a police officer "reasonably to conclude in light of his experience that criminal activity may be afoot."

*State v. Battle*, 109 N.C. App. 367, 370, 427 S.E.2d 156, 158 (1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 20 L. Ed. 2d 889, 911 (1968)); *see State v. Hendrickson*, 124 N.C. App. 150, 155, 476 S.E.2d 389, 392 (1996) (brief investigatory stop constitutes Fourth Amendment seizure that must be supported by "a reasonable and articulable suspicion that the person seized is engaged in criminal activity") (citation omitted). A minimal level of objective justification, although something more than an "unparticularized suspicion or hunch," is the sole requirement for such a stop. *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989) (citation omitted).

To constitute a valid and constitutional investigative stop, a police officer's actions must be both

> justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place.

*State v. Thompson*, 296 N.C. 703, 706, 252 S.E.2d 776, 779, *cert. denied*, 444 U.S. 907, 62 L. Ed. 2d 143 (1979) (citation omitted). In determining on appeal whether the standard of a "reasonable" and "articulable" suspicion, *Sokolow*, 490 U.S. at 7, 104 L. Ed. 2d at 10, has been met, a reviewing court must

> examine both the articulable facts known to the officers at the time they determined to approach and investigate the activities of the [suspects] . . . and the rational inferences which the officers were entitled to draw from those facts.

*Thompson*, 296 N.C. at 706, 252 S.E.2d at 779. The foregoing circumstances are to be viewed as a whole "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.* (citation omitted).

Initially, we note that review of the record reveals Judge Greeson's findings of fact to be supported by competent evidence and thus binding on appeal. *See Cooke*, 306 N.C. at 134, 291 S.E.2d at 619. Applying the principles set forth above in conducting a *de novo* determination, *see Mahaley*, 332 N.C. at 592-93, 423 S.E.2d at 64, of whether Judge Greeson's conclusions of law are sustained by his findings of fact, we must give "due weight to inferences drawn from th[e] facts by resident judges and local law enforcement officers," *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920 (1996), and view the facts "through the eyes of a reasonable, cautious officer, guided by his experience and training," *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994), in light of the totality of the circumstances, *id.*

Judge Greeson concluded as a matter of law that the

officers had reasonable and articulable suspicion that criminal activity was afoot and were justified in stopping the vehicle operated by [defendant].

*See Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920-21. We therefore examine both the articulable facts as found by Judge Greeson, *see Cooke*, 306 N.C. at 134, 291 S.E.2d at 619, to be known to the detectives at the time they determined to stop defendant's vehicle, as well as the rational inferences the detectives were entitled to draw from these facts. *See Watkins*, 337 N.C. at 441, 446 S.E.2d at 70 (police officers may draw inferences based upon personal experiences).

Detectives Graves and Wallace, both employed by the Department for over seven years and with at least three years experience as detectives in the Vice and Narcotics Division, testified at the suppression hearing as to the facts and circumstances giving rise to the investigatory stop of defendant's automobile. They reported that several months prior to Weaver's arrest, two confidential informants close to Weaver had informed the Department that Weaver "had an apartment or frequented an apartment out on Winn [sic] Road," but were unable to give a specific address. When Dalton telephoned Weaver seeking to arrange a cocaine purchase, the detectives connected the earlier information with Weaver's request that Dalton meet him near Wind Road, and concluded that drugs distributed by Weaver were kept somewhere on Wind Road.

Following his arrest, Weaver stated he lived with his sister at 2107 Windsor Street and "was pretty insistent" the detectives search

it for contraband. When the latter arrived at the Windsor address, Boyce, who was present and claimed to be a resident, consented to a search of the house and his person. The detectives found no contraband, but retrieved a $350.00 Western Union money transfer receipt from Boyce's wallet that listed Boyce as the sender and 206 Wind Road as his address. The detectives noted the receipt designated an address inconsistent with Boyce's claim he resided at Windsor Street, but located in the area where they had concluded Weaver stored drugs for distribution.

In addition, the identification card recovered from Boyce's wallet displayed a photo of Blaylock bearing the name Markus Watlington. The detectives had arrested Blaylock and Weaver the night before and thus knew Blaylock was falsely depicted on the card. Additionally, Boyce had revealed to the detectives that Blaylock had a girlfriend on Wind Road and that Blaylock had lived with her at one time.

In the words of Graves, the detectives

responded to 206 Winn [sic] Road based on inconsistencies that [Boyce] had given us, Tommie Blaylock['s connections], the fictitious ID card, a[nd] . . . the receipt.

Graves added that "drug dealers directly [sic] have a stash house somewhere else besides where they reside," and that the cumulation of information received by the detectives throughout their investigation, and particularly during the preceding two days, led them to believe Weaver's "stash house" was located at 206 Wind Road.

In addition, the detectives considered Boyce's reaction when they discovered the Western Union money transfer receipt and identification card, as well as his subsequent request for transportation to Market Street so as to place a telephone call. According to Wallace, Boyce "became very interested as to why we were interested in [the receipt]." As a result of Boyce's reaction the detectives surmised he

was going to call persons out at [206] Winn [sic] Road and advise them that we had found paperwork leading us to that address.

In view of all the foregoing factors, each contained in Judge Greeson's findings of fact, see Cooke, 306 N.C. at 134, 291 S.E.2d at 619, the detectives elected to set up surveillance at 206 Wind Road. Accordingly, after leaving Boyce on Market Street and making a brief

stop at the Department, they proceeded directly to that location, arriving around 1:00 a.m.

The detectives concealed themselves in front of the twelve unit apartment complex at 206 Wind Road. According to Graves, within minutes they observed two men, later identified as Ammonds and Gooden, and a woman, later identified as defendant, exit the complex and "walk[] hurriedly or kind of trot[]" to a parked vehicle in the parking lot. The detectives noticed one of the men carried what appeared to be a rifle wrapped in a blanket while the other had a black tote bag; the men placed these items in the trunk of the automobile. Defendant carried a brown paper shopping bag with handles which she set behind the driver's seat of the vehicle before driving off. Graves related that as defendant left and the two men returned to the apartment complex, one "apparently observed us and walk[ed] around on the back side of the building," prompting Wallace to investigate. After finding nothing in the area, the detectives concluded the man had been "acting up" and "possibly trying to discourage [them] from following [defendant]." They then decided to pursue and stop the vehicle operated by defendant.

Graves explained this latter decision was based upon the detectives' "reasonable suspicion that the[] subjects were carrying illegal contraband based on the activities of—that we observed them carrying that late at night, at 1:00 in the morning." Wallace added that the detectives also considered the following: 1) Weaver was known to keep an apartment near 206 Wind Road, 2) Weaver initially wanted to meet Dalton in the Wind Road area for a drug transaction, 3) Weaver and Blaylock had direct connections with Wind Road, 4) Boyce was linked to the 206 Wind Road address and was expected to warn his "cohorts" that the detectives had discovered the receipt listing that address, 5) they observed the three individuals rush from the apartment complex at 1:00 in the morning, 6) they expected to observe suspicious activity at 206 Wind Road on that particular night, and 7) they believed the three people were involved in drug activity upon seeing one of the men place a rifle in the trunk based upon their experience that "oftentimes guns . . . are associated with narcotics and drug dealers."

While a single one of the above factors relied upon by the detectives might not in itself have been sufficient to sustain a reasonable suspicion that criminal conduct was underway, and may well have been consistent with innocent behavior, we conclude that the composite of the factors as detailed in Judge Greeson's findings of fact,

*see Cooke*, 306 N.C. at 134, 291 S.E.2d at 619, adequately sustained a reasonable and articulable suspicion that criminal activity was afoot, *see Sokolow*, 490 U.S. at 9-10, 104 L. Ed. 2d at 12 (in determining existence of reasonable suspicion for investigative stop, relevant inquiry is not whether particular conduct is innocent or guilty, but degree of suspicion which attaches to particular types of noncriminal acts), and *see generally Reid v. Georgia*, 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894 (1980) (there may be "circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot"), and thus supported Judge Greeson's conclusion of law to that effect.

We note, for example, that courts have recognized factors such as activity at an "unusual hour," *Watkins*, 337 N.C. at 442, 446 S.E.2d at 70 (citation omitted), and " 'an area's disposition toward criminal activity' " as articulable circumstances which may be considered along with more particularized factors to support a reasonable suspicion, *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (quoting *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987), *cert. denied*, 484 U.S. 965, 98 L. Ed. 2d 396 (1987)); *see United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (observation of defendant at nearly 1:00 a.m. in area known to have propensity for criminal drug activity may raise requisite level of suspicion; lateness of hour a factor which may raise reasonable suspicion to conduct an investigative stop). In the instant case, from the perspective of the detectives drawn from years of experience in drug investigations, presence of the three individuals in the early morning at an address connected to drug involvement through numerous sources bolstered the suspicion that the three hurrying from the complex were involved in criminal activity and that defendant was likely transporting controlled substances in her vehicle.

In *State v. Tillet* and *State v. Smith*, 50 N.C. App. 520, 274 S.E.2d 361 (1981), moreover, this Court upheld the investigatory stop of a vehicle on facts less compelling than those *sub judice*. In *Tillet*, a law enforcement officer observed an automobile at about 9:40 p.m. entering a heavily wooded dirt road leading "to a number of seasonal residences, only one of which was occupied at that time of the year." *Id.* at 524, 274 S.E.2d at 364. The officer, aware of "firelighting" deer reports near the site, stopped the vehicle when it emerged from the area. We concluded that, based upon the officer's experience, it was not unreasonable "[t]o infer from the[] facts that the occupants of the vehicle were engaged in some sort of criminal activity," *id.*, in view of the time of day and the officer's prior knowledge of the propensity of

the area for criminal conduct, *id.*; *see State v. Fox*, 58 N.C. App. 692, 695, 294 S.E.2d 410, 412-13 (1982) (reasonable suspicion existed for investigatory stop when: 1) defendant driving slowly down dead-end street where businesses had previously been robbed, 2) defendant dressed shabbily but vehicle was a "real nice" car, 3) defendant did not communicate with officer but appeared to avoid his gaze in passing, and 4) the stop occurred in the early morning hours), *aff'd*, 307 N.C. 460, 298 S.E.2d 388 (1983).

In the case *sub judice*, the culmination of facts and circumstances arising during the detectives' on-going investigation provided objective justification beyond a mere hunch to support a "common sense conclusion[]," *United States v. Cortez*, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629 (1981) (evidence considered to determine whether reasonable suspicion exists "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement ... [for a] common sense conclusion[]"), "that criminal activity may [have] be[en] afoot," *Battle*, 109 N.C. App. at 370, 427 S.E.2d at 158 (citation omitted). The detectives' prior knowledge of various connections between the Wind Road address and drug activity, coupled with their 1:00 a.m. observations at the address on a night they expected to observe suspicious drug-related conduct as well as the circumstances surrounding defendant's actions on 2 February 1996, provided a sufficient basis for those experienced law enforcement officers to draw a reasonable inference "that criminal activity was afoot," *id.*, thus warranting the investigative stop. Accordingly, Judge Greeson's findings of fact sustained his conclusion of law upholding the search, *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619, and neither Judge Greeson nor Judge Albright erred in denying defendant's motions to suppress.

**[2]** Defendant next contends the imposition of consecutive sentences by Judge Webb violated the United States and North Carolina constitutional prohibitions against cruel and unusual punishment. Specifically, defendant argues her sentence was disproportionate to the crimes because her more culpable co-conspirators received lesser or equivalent sentences. Defendant points to the comments of Judge Albright who continued defendant's sentencing so all co-defendants would be sentenced during the same proceeding.

Judge Albright indicated it would be an "absolute perversion of justice" should the "bigger fry" receive a more lenient sentence than defendant:

You don't want one sentence getting out of line with the rest of them if everybody understands what I'm trying to say. It would be a miscarriage of justice for her to get the heavy sentence and the others get the light sentence. That's what I'm trying to say. It ought to be the other way around.

While advertent to defendant's arguments and the comments of the able and experienced trial judge, we conclude that this assignment of error fails.

We note first that defendant in her appellate brief relies solely upon the Eighth Amendment to the United States Constitution (the Eighth Amendment) and federal and state decisions applying that amendment. However, the Eighth Amendment is not cited as the basis of defendant's assignment of error challenging the sentence imposed. *See* N.C.R. App. P. 10(a) ("scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal"), and *State v. Frye*, 341 N.C. 470, 495-96, 461 S.E.2d 664, 676-77 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996) (defendant who objected to introduction of "evidence on only one ground" failed to preserve for review additional grounds raised on appeal).

In addition, save for her generalized reliance upon the Eighth Amendment, defendant has cited no authority or court decision requiring a trial court to apportion strict degrees of culpability among co-defendants when imposing sentence. *See* N.C.R. App. P. 28 (b)(5) ("[a]ssignments of error . . . in support of which no reason or argument is stated or authority cited, will be taken as abandoned").

Finally, assuming *arguendo* defendant's argument is properly before us, it is unfounded. *See State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 441 (1983) ("[o]nly in exceedingly unusual non-capital cases will . . . sentences imposed be so grossly disproportionate as to violate the Eighth Amendment's proscription of cruel and unusual punishment").

We first note our Supreme Court has held that

[t]he [Eighth Amendment's] prohibition against cruel and unusual punishment "does not require strict proportionality between the crime and sentence . . . [but] forbids only extreme sentences that are 'grossly disproportionate' to the crime."

*State v. Green*, 348 N.C. 588, 609, 502 S.E.2d 819, 832 (1998), *cert. denied*, 525 U.S. 1111, 142 L. Ed. 2d 783 (1999) (citations omitted); *see Heatherly v. Industrial Health Council*, 130 N.C. App. 616, 621, 504 S.E.2d 102, 106 (1998) (citation omitted) (Court of Appeals "required to follow decisions of our Supreme Court"). Indeed, the sentences imposed upon defendant, albeit consecutive, were within the presumptive statutory range authorized for her drug trafficking offenses under the Structured Sentencing Act. *See* N.C.G.S. § 90-95(h)(3)(b) (1999) (trafficking in cocaine in amount of "200 grams or more, but less than 400 grams," punishable by "a minimum term of 70 months and a maximum term of 84 months"), *State v. Collins*, 81 N.C. App. 346, 354, 344 S.E.2d 310, 316 (1986) (no constitutionally disproportionate sentence where "defendant received the statutory minimum sentence mandated by the legislature for *all persons* convicted of this class of crime") (emphasis in original), and *State v. Barts*, 316 N.C. 666, 697, 343 S.E.2d 828, 848 (1986) (citations omitted) (consecutive sentences upon several serious felony counts "does not violate any constitutional proportionality requirement" in that all sentences imposed "were within the limits prescribed by the General Assembly" and "imposition of consecutive sentences, standing alone, does not constitute cruel and unusual punishment").

Further, the Eighth Amendment is not offended by variance in sentence terms among co-defendants where some have pleaded guilty and others were convicted by a jury. *See State v. Shane*, 309 N.C. 438, 446, 306 S.E.2d 765, 770 (1983), *cert. denied*, 465 U.S. 1104, 80 L. Ed. 2d 134 (1984) (sentences imposed for defendants who committed similar sex crimes not disproportionate under Eight Amendment where one defendant pleaded guilty to lesser charges and received two consecutive ten year terms and other was convicted by jury and sentenced to life imprisonment).

Lastly, the comments of Judge Albright upon which defendant heavily relies were rendered prior to the plea arrangements of defendant's co-defendants.

No error.

Judges LEWIS and McGEE concur.