McCULLOUGH, Judge.
 

 Defendant Natasha Renee Foye was convicted at the 19 September 2002 Criminal Session of Guilford County Superior Court of the charge of trafficking in cocaine by transporting 400 grams or more. Defendant received a sentence of a minimum of 175 months to the maximum 219 months and a fine of $250,000. In an earlier trial, a different jury was unable to render a verdict on the trafficking charges. Prior to that earlier trial, a suppression hearing was held by the Honorable James M. Webb, Superior Court Judge, concerning evidence seized from a car defendant was driving immediately prior to her arrest. Judge Webb's order concluded the evidence was admissible, and it was used for the conviction now on appeal. The State's evidence tended to show the following: On 9 October 2000, Sergeant Rick Smith of the Greensboro Police Department contacted Detective Kyle Shearer (Detective Shearer) of the same department's Vice and Narcotic Unit concerning a suspicious traffic accident report. At the accident site, officers found a ballistics vest, weapons, and a small amount of marijuana. A person involved in the accident, Walter Lamar Watkins (Watkins), was arrested for narcotics. Watkins resided at 128D Walnut Circle located in the Bent Tree Apartments complex in Greensboro.
 

 Based on this information, on 10 October 2000, Detective Shearer went to the Bent Tree complex looking to locate a white Infiniti alleged to have been involved in the accident. Detective Shearer circled the lot and noted a silver Mercedes Benz close to Watkins' address. This car caught Detective Shearer's attention as an expensive car in an area where some of the residents were federally subsidized. The Detective ran the Mercedes' tags and the car came back as registered to Roderick Brunson (Brunson) of Eden, North Carolina. He also discovered Brunson had a suspended driver's license and pending narcotics charges in New York. The Detective then left for the day.
 

 In the morning briefing of 11 October 2000, Detective Shearer asked other narcotic and vice officers whether they knew of Brunson or narcotic sales at the Bent Tree complex. Detective John Sturm (Detective Sturm) informed Detective Shearer that there was an ongoing investigation in conjunction with Forsyth County Sheriff's Department of a subject by the name of Demetrius Dudley (Dudley)who was believed to be selling controlled substances from the Bent Tree Apartments complex. Detective Sturm suggested this may be part of a larger drug operation originating out of Martinsville, Virginia. Detective Shearer contacted law enforcement agents in Virginia and learned that Brunson had a Virginia address.
 

 On 12 October 2000, Detective Shearer went back to the parking area of the Bent Tree Apartments and observed a four-door, burgundy, Nissan Maxima parked near building 128 of the complex and registered with Virginia tags to James A. Martin (Martin). Martin had a Martinsville, Virginia, address. Detective Shearer also observed Brunson exit building 132 of the complex and walk to the Nissan, open the trunk, and then walk to his Mercedes, enter it, and drive away. Detective Shearer tried to follow him, but lost him.
 

 On the night of 17 October 2000, Detective Shearer assisted Detective Sturm with a narcotics transaction utilizing an informant from the Forsyth County Sheriff's Department and involving one kilogram of cocaine which was to be received by Dudley. Detective Shearer was assigned surveillance duties for the night transaction. Dudley was observed behind a carwash, not washing his car, as the driver of a Buick drove up and appeared to meet with him. The driver than drove to 107 Walnut Street, on the same block as Bent Tree Apartments. Detective Shearer observed Brunson arrive at that same address in the previously observed Nissan. Brunson then drove to the area behind the carwash, appearing to meet with Dudley. Detective Shearer then followed Brunson as he drove to building 132of the Bent Tree complex. Brunson got out of the Nissan, and approaching his Mercedes, stopped a sports utility vehicle (SUV). He exchanged something with the driver. The SUV then left, and Brunson got in his Mercedes and drove away. Dudley was observed returning to Bent Tree Apartments in his SUV, and walked into one of the buildings. Sometime shortly thereafter, he left in the same SUV to go to a Blockbuster Video parking lot. This is where the transaction with the informant was set to take place. Dudley was arrested and found in possession of approximately one kilogram of cocaine. His residence at Bent Tree Apartments was then searched and another kilogram was seized.
 

 On 19 October 2000, Detective Shearer returned to the Bent Tree complex for surveillance believing he might see something similar to the Dudley transaction. Driving through the parking lot, he saw a man in a Lexus coupe with Virginia tags parked in front of one of the complex's buildings. Brunson then exited building 132 and approached the Lexus. The man in the Lexus got out, talked to Brunson, and then they both returned to building 132. After five minutes, the two men exited carrying a white shopping bag containing some object. Brunson got in his Mercedes and the other man in the Lexus. The two cars drove in tandem and Detective Shearer followed. He called for back-up believing another narcotics transaction was about to take place. The two cars drove to a gas station, purchased no gas, but parked close together to talk. The cars then split-up. The Lexus first went to a Harris Teeter parking lot, then a Chic-Fil-A, where the driver wentinside, purchased nothing, but observed the parking lot from the glass entry. He then returned to his Lexus, drove back to the Harris Teeter lot and waited for 15 or 20 minutes. At this point, Detective Shearer's back-up arrived and they were briefed. Detective Shearer and the officers now on the scene saw a white Cadillac operated by a female pull in the Harris Teeter lot. The car's high beams flashed twice. The Lexus pulled in closely behind the Cadillac, and the cars traveled closely through the lot. After they stopped, Brunson got out of the passenger side of the Cadillac, walked back to the Lexus, and got in the passenger's side. The Cadillac left the area, and Detective Shearer asked two of his supporting officers to stop the driver based on his observations of Brunson's previous activities. The two supporting officer's stopped the Cadillac, and asked defendant driver for her license and registration. Upset and crying, she said she did not have any. When asked to step out of the car, she asked if she was in trouble. She then sat on the curb, crying. Upon request by the supporting Officer Kroh, she gave permission to search the Cadillac, nodding her head and saying "yeah." A bag of approximately half a kilogram of what was later determined to be cocaine was seized from the floorboards of the backseat on the passenger's side of the car. In a subsequent consent search of an apartment listed in defendant's name, detectives found money, ziploc baggies, a weapon, and personal items of defendant.
 

 Defendant raises three issues on appeal: first, defendant contends that the trial court committed reversible error in denyingdefendant's motion to suppress evidence that was confiscated from the stop of the Cadillac; second, that the trial court erred in permitting testimony of a State Bureau of Investigations (SBI) agent as to the identity of the objects seized from the Cadillac, when the agent did not perform the identifying test; and (3) lastly, the trial court erred in charging the jury that defendant need not know that she was transporting more than 400 grams of cocaine to find her guilty of trafficking. For the reasons stated hereunder, we overrule all assignments of error.
 

 Lawful Stop and Search
 

 Defendant contends that there was no rational basis for the officers, under the command of Detective Shearer, to stop defendant driving the Cadillac. Thus, defendant argues evidence procured as a result of the unlawful stop is inadmissible under the Constitution's Fourth Amendment guarantee against illegal searches and seizure. We disagree.
 

 The applicable standard in reviewing a trial court's determination on a motion to suppress is that the trial court's findings of fact "are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting."
 
 State v. Eason,
 

 336 N.C. 730
 
 , 745,
 
 445 S.E.2d 917
 
 , 926 (1994),
 
 cert. denied,
 

 513 U.S. 1096
 
 ,
 
 130 L. Ed. 2d 661
 
 (1995). Any conclusions of law reached by the trial court in determining whether defendant was lawfully stopped "must be legally correct, reflecting a correct application of applicable legal principles to the facts found."
 
 State v. Fernandez,
 

 346 N.C. 1
 
 , 11,
 
 484 S.E.2d 350
 
 , 357 (1997). Weafford the trial court great deference in its findings as it "sees the witnesses, observes their demeanor as they testify and by reason of his more favorable position, he is given the responsibility of discovering the truth."
 
 State v. Smith,
 

 278 N.C. 36
 
 , 41,
 
 178 S.E.2d 597
 
 , 601,
 
 cert. denied,
 

 403 U.S. 934
 
 ,
 
 29 L. Ed. 2d 715
 
 (1971). Our position is much less favored in questioning findings of fact as we see only a cold, written record. Hence the findings of the trial judge are, and properly should be, conclusive on appeal if they are supported by the evidence.
 
 State v. Barnes,
 

 264 N.C. 517
 
 ,
 
 142 S.E.2d 344
 
 (1965);
 
 State v. Moore,
 

 275 N.C. 141
 
 ,
 
 166 S.E.2d 53
 
 (1969);
 
 State v. Wright,
 

 275 N.C. 242
 
 ,
 
 166 S.E.2d 681
 
 ,
 
 cert. denied,
 

 396 U.S. 934
 
 ,
 
 24 L. Ed. 2d 232
 
 (1969). In determining whether the findings of fact sustain the trial court's conclusions of law, we must provide "due weight to inferences drawn from those facts by resident judges and law enforcement officers."
 
 State v. VanCamp,
 

 150 N.C. App. 347
 
 , 352,
 
 562 S.E.2d 921
 
 , 925-26 (2002) (quoting
 
 Ornelas v. United States,
 

 517 U.S. 690
 
 , 699,
 
 134 L. Ed. 2d 911
 
 , 920 (1996)).
 

 Only unreasonable investigatory stops are unconstitutional.
 
 Terry v. Ohio,
 

 392 U.S. 1
 
 , 9,
 
 20 L. Ed. 2d 889
 
 , 899 (1968). An investigatory stop must be justified by "`a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.'"
 
 Brown v. Texas,
 

 443 U.S. 47
 
 , 51,
 
 61 L. Ed. 2d 357
 
 , 362 (1979). In adopting the federal legal standards for determining reasonable suspicion, our Supreme Court stated: A court must consider "the totality of the circumstances-the whole picture" in determining whether a reasonable suspicion to make an investigatory stop exists. The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. The only requirement is a minimal level of objective justification, something more than an "unparticularized suspicion or hunch."
 

 State v. Watkins,
 

 337 N.C. 437
 
 , 441-42,
 
 446 S.E.2d 67
 
 , 70 (1994) (citations omitted).
 

 At the suppression hearing, Detective Shearer offered uncontested evidence relating to his surveillance of the Bent Tree Apartments complex, and the illegal narcotic operations being run out of the complex. Using his experience of eight years with the Vice and Narcotics Unit, he was lead to the complex by evidence of drugs and weapons found near the automobile accident of one of the complex's residents. When investigating the complex, Detective Shearer observed a number of objective factors establishing his suspicions. Each of these factors involved Brunson: Brunson drove a Mercedes while staying at a complex with some federally subsidized inhabitants; he had a suspended driver's license and pending narcotics charges in New York; he was involved with Dudley, a subject under joint investigation by Forsyth and Guilford Counties for being linked to a large drug ring running out of Martinsville, Virginia; he conducted some transaction at the apartment complex immediately after meeting with Dudley the night Dudley was arrested; two days later he met with a man fromMartinsville at the complex and was carrying a white bag and drove out of the complex in tandem, he in his Mercedes and the other man in a Lexus, went to a gas station where all they did was talk and then separated; that same night, the Lexus was observed in a Harris Teeter parking lot apparently waiting and in a counter-surveillance fashion, when a Cadillac driven by defendant pulled into the parking lot and approached; also that night, the Cadillac flashed its high-beams twice, and the Lexus followed closely behind the Cadillac across the parking lot, where they stopped and Brunson emerged from the Cadillac carrying the same white bag he had at the complex and got in the passenger side of the Lexus.
 

 The evidence and inferences drawn therefrom are sufficient to conclude that Brunson, by the time defendant was arrested, carried over him a cloud of reasonable suspicion based upon the events leading up to defendant's arrest. There is competent evidence of Detective Shearer's reasonable suspicion, and that the supporting officer who stopped the Cadillac had been sufficiently briefed on the suspicious activities of Brunson. Therefore, when Brunson was seen emerging from the Cadillac to get into the Lexus with the same white bag he had carried from the apartment complex, a complex already known as a source of narcotics, there was at that point reasonable suspicion to stop both cars.
 
 See State v. Parker,
 

 137 N.C. App. 590
 
 , 602,
 
 530 S.E.2d 297
 
 , 305 (2000) (The time of night and the detective's knowledge of the area as common for drug trafficking supported the reasonability of the stop).
 
 State v. Fox,
 

 58 N.C. App. 692
 
 , 695,
 
 294 S.E.2d 410
 
 , 412-13 (1982),
 
 aff'd,
 

 307 N.C. 460
 
 ,
 
 298 S.E.2d 388
 
 (1983) (reasonable suspicion existed for investigatory stop when: (1) defendant was driving slowly down dead-end street where businesses had previously been robbed; (2) defendant was dressed shabbily but vehicle was expensive; (3) defendant did not communicate with officer but appeared to avoid his gaze in passing; and (4) the stop occurred in the early morning hours).
 

 Defendant also contends that her consent to search the Cadillac after the stop, was involuntary. When, as here, the State seeks to rely upon defendant's consent to support the validity of a search, it has the burden of proving that the consent was voluntary.
 
 State v. Hunt,
 

 37 N.C. App. 315
 
 , 321,
 
 246 S.E.2d 159
 
 , 163 (1978);
 
 Schneckloth v. Bustamonte,
 

 412 U.S. 218
 
 ,
 
 36 L. Ed. 2d 854
 
 (1973). Voluntariness is a question of fact to be determined from all of the surrounding circumstances.
 
 State v. Williams,
 

 314 N.C. 337
 
 , 344,
 
 333 S.E.2d 708
 
 , 714 (1985). The State must then bring forth clear and convincing evidence that consent was in fact, freely and voluntarily given.
 
 State v. Vestal,
 

 278 N.C. 561
 
 ,
 
 180 S.E.2d 755
 
 (1971).
 

 We conclude there was clear and convincing evidence, supporting the trial court's finding that consent was voluntarily given. There was no evidence of coercion, lack of voluntary consent, and no reliance on any illusory legal authority by the State in procuring consent.
 
 C.F. Bumper v. North Carolina,
 

 391 U.S. 543
 
 , 548-50,
 
 20 L. Ed. 2d 797
 
 , 802-03 (1968) (a defendant acting under the belief the State has a warrant for the search when givingconsent is not voluntary). Testimony by the officer that sought consent reveals that consent was asked for twice, and both times given verbally and by physical manifestation. Furthermore, there is evidence that the officer was attempting to calm her emotional state and not acting in a coercive manner.
 

 All assignments of error related to the suppression order are overruled. Additionally, we note defendant did not properly present an argument in her brief concerning assignments of error relating to evidence seized from the apartment at the Bent Tree complex, and we deem that assignment abandoned under North Carolina Rules of Appellate Procedure, Rule 28(b)(6).
 

 Testimony of SBI Agent
 

 Defendant next contends that it was reversible error by the trial court to allow the testimony of SBI Agent Nancy Gregory (Agent Gregory) to identify the evidence seized from the Cadillac as cocaine when she was not the agent who actually tested the substance. Defendant argues the court's admittance of this testimony denied her the guarantees of the Constitution's Sixth Amendment right to confront her accusers. We disagree.
 

 Admissibility of an expert opinion based on an out-of-court communication is now governed by Rule 703. This rule provides:
 

 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 

 N.C. Gen. Stat. § 8C-1, Rule 703 (2003). Our Supreme Court has held that testimony as to information relied upon by an expert when offered to show the basis for the expert's opinion is not hearsay, since it is not offered as substantive evidence.
 
 State v. Wood,
 

 306 N.C. 510
 
 ,
 
 294 S.E.2d 310
 
 (1982). Such evidence is admissible due to the limited purpose for which it is offered and not due to an exception to the hearsay rule.
 

 Id.
 

 It is the expert opinion itself, not its underlying factual basis, that constitutes substantive evidence.
 
 State v. Wade,
 

 296 N.C. 454
 
 ,
 
 251 S.E.2d 407
 
 (1979). The admission into evidence of expert opinion based upon information not itself admissible into evidence does not violate the Sixth Amendment guarantee of the right of an accused to confront his accusers where the expert is available for cross-examination.
 
 State v. Huffstetler,
 

 312 N.C. 92
 
 , 108,
 
 322 S.E.2d 110
 
 , 120-21 (1984),
 
 cert. denied,
 

 471 U.S. 1009
 
 ,
 
 85 L. Ed. 2d 169
 
 (1985).
 

 In
 
 Huffstetler,
 
 after being properly qualified as an expert in the field of forensic serology, the expert testified that based on the results of ten blood tests performed at the SBI laboratory, her opinion was that the blood found on the clothing identified as defendant's was consistent with the blood of the victim. This was based partially on another SBI agent's tests and report. The court found this admissible as it was offered only to show the basis of her expert opinion, and not for the truth of the matter asserted.
 
 See also State v. Jackson,
 

 302 N.C. 101
 
 ,
 
 273 S.E.2d 666
 
 (1981) (psychiatrist based opinion on tests not personally administered byhim);
 
 State v. Franks,
 

 300 N.C. 1
 
 ,
 
 265 S.E.2d 177
 
 (1980) (psychiatrist's opinion based on examination as well as patient's statements);
 
 Booker v. Duke Medical Center,
 

 297 N.C. 458
 
 ,
 
 256 S.E.2d 189
 
 (1979) (no error in allowing physician to testify based on medical history obtained from a treating physician and the patient);
 
 State v. Louchheim,
 

 296 N.C. 314
 
 ,
 
 250 S.E.2d 630
 
 ,
 
 cert. denied,
 

 444 U.S. 836
 
 ,
 
 62 L. Ed. 2d 47
 
 (1979) (An expert in the field of accounting gave his opinion based on documents not in evidence.).
 

 In this case, much like that in
 
 Huffstetler,
 
 defendant did not challenge Agent Gregory's expert qualifications. Agent Gregory testified that she reviewed the notes and the data underlying the conclusions of the testing agent, and that, in her experience, such documentation from testing agents is "inherently reliable." She went on to testify that, based on her independent review of the testing agent's analysis, it was her opinion that there were "five-hundred-and-five-point eight grams of schedule II controlled substance cocaine" in the State's exhibit which had been seized from the Cadillac. Agent Gregory was then subject to cross-examination by defendant.
 

 Pursuant to the clear precedent of
 
 Huffstetler,
 
 we overrule this assignment of error.
 

 Knowledge of Possessing/Transporting More than 400 Grams
 

 Defendant's final assignment of error relates to an answer given by the trial court to the jury's question concerning the weight element of the trafficking charges. Defendant contends thecourt's reply that there is no requirement that defendant know the quantity of the controlled substance, so long as they knew they were in possession or transporting a controlled substance, was error because it was tantamount to a willful blindness jury charge disallowed by
 
 State v. Bogle,
 

 324 N.C. 190
 
 ,
 
 376 S.E.2d 745
 
 (1989). We disagree.
 

 In
 
 Bogle,
 
 our Supreme Court held that the willful blindness doctrine was not consistent with North Carolina law. The willful blindness doctrine allowed a jury to construct a guilty mind when evidence shows the defendant was aware of the high probability of the existence of a fact, but acted with a conscious purpose to avoid the truth, unless he actually believed the fact not to exist.
 
 Bogle,
 

 324 N.C. at 194-95
 
 ,
 
 376 S.E.2d at 747-48
 
 . The Court in
 
 Bogle
 
 makes clear that the willful blindness doctrine applies to elements of crimes where knowledge is a substantive feature.
 
 Id.
 
 at 95,
 
 376 S.E.2d at 748
 
 .
 

 Under North Carolina's trafficking laws, there is no requirement that the defendant actually know the quantity of the drug the defendant is alleged to possess/transport; the knowing requirement is attached to the possessing/transporting of the controlled substance, no matter its quantity. This Court has recently addressed this issue, holding that:
 

 [T]o convict an individual of drug trafficking the State is
 
 not
 
 required to prove that defendant had knowledge of the weight or amount of methamphetamine which he knowingly possessed or transported. Instead, the statute requires only that the defendant knowingly possess or transport the controlledsubstances; if the amount exceeds 28 grams, then a conviction for trafficking may be obtained.
 

 State v. Shelman,
 

 159 N.C. App. 300
 
 , 306,
 
 584 S.E.2d 88
 
 , 93 (emphasis in original),
 
 disc. review denied,
 

 357 N.C. 581
 
 ,
 
 589 S.E.2d 363
 
 (2003). Pursuant to
 
 Shelman,
 
 we have held the trial court is not in error when failing to instruct the jury that defendant must have known the quantity of the drug to be found guilty of trafficking.
 
 State v. Foster,
 
 ___ N.C. App. ___, ___,
 
 592 S.E.2d 259
 
 , 262-63 (2004). Therefore,
 
 Bogle
 
 is inapplicable and this assignment of error is overruled.
 

 After thorough review of the record, briefs, and transcripts from the suppression hearing and the subsequent trial of defendant's case, we hold she received a trial free from error. All assignments of error not addressed herein have been reviewed, and we conclude are without merit.
 

 No error.
 

 Judges HUNTER and LEVINSON concur.
 

 Report Per Rule 30(e).