Murphy, Judge, dissenting.
I accept the facts portion as set out by the Majority, however, the facts demonstrate that there was a reasonably articulable suspicion that criminal activity was afoot when Lt. Marotz seized Defendant. Therefore, I respectfully dissent from the Majority's holding that the trial court erred by denying Defendant's motion to suppress.
On appeal, Defendant argues, and the Majority agrees, that the trial court erred by denying Defendant's motion to suppress because Lt. Marotz lacked the reasonable suspicion that was required to stop Defendant. I disagree, because Lt. Marotz operated within the bounds of the Fourth Amendment's protections, only seizing Defendant once there was a reasonably articulable suspicion that criminal activity was afoot.
In Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id . at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906-07. This is because "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Adams v. Williams , 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617 (1972). Thus, "[a] brief stop of a suspicious individual ... may be most reasonable in light of the facts known to the officer at the time" so that the officer can "maintain the status quo momentarily" to gather more information. Id. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617 (citations omitted).
We "consider the totality of the circumstances-the whole picture in determining whether a reasonable suspicion to make an investigatory stop exists." State v. Watkins , 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (quotation omitted). "An investigatory stop must be justified by a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." Id . at 441, 446 S.E.2d at 70 (quotation *681 omitted). These facts must be "specific and articulable[,]" and we also consider "the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training." Id . at 441-42, 446 S.E.2d at 70 (citations omitted). Conduct may "justify the suspicion that criminal activity was afoot[,]" even if, in other circumstances, the conduct would be "wholly lawful." *359 United States v. Sokolow , 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1, 11 (1989) (quotation omitted). For example, when an activity occurs "at an unusual hour" we have considered it an articulable circumstance that may be considered "along with more particularized factors to support reasonable suspicion[.]" State v. Parker, 137 N.C. App. 590, 601, 530 S.E.2d 297, 304 (2000) (quotations and citations omitted).
Whether the requisite reasonable suspicion to stop Defendant existed is a conclusion of law. Thus, I apply the principles set forth above in a de novo determination of whether reasonable suspicion to make an investigatory stop existed, giving "due weight to inferences drawn from the facts by resident judges and local law enforcement officers, and view[ing] the facts through the eyes of a reasonable, cautious officer, guided by his experience and training, in light of the totality of the circumstances." Id. at 598, 530 S.E.2d at 302 (quotations and alterations omitted). This analysis assumes the seizure occurred when Lt. Marotz stopped Defendant from going to the store.[21]
At the outset, I emphasize that the objective facts are viewed through the lens of a reasonable, cautious officer , not based on Lt. Marotz's subjective analysis of the law. I note this point as the Majority places too much weight on Lt. Marotz's analysis on cross-examination as to whether there was evidence of criminal activity he could point to at the time of seizure. In doing so, the Majority relies on a case where the officer relied on a hunch and "never articulated any specific facts about the vehicle itself to justify the stop...." State v. Murray , 192 N.C. App. 684, 689, 666 S.E.2d 205, 208 (2008) (emphasis added). In contrast, Lt. Marotz articulated objective facts about Defendant, from which a reasonable, cautious officer could infer that an individual is involved in criminal activity.
Lt. Marotz first noticed the vehicle from which Defendant emerged because it was parked in the middle of a turning lane at an unusual hour-4 a.m.-with windows rolled down, even though there was "misting rain" and the temperature was in the "40s." He also noted the unusual *682 seating arrangement of the vehicle's two passengers, where one man sat directly behind the driver, and was "concerned" when Defendant pulled "a toboggan-style mask of some kind"-with what "looked like two cutouts"-over his head to approximately "the bridge of [his] nose[,]" and then removed it when Lt. Marotz pulled his patrol car up next to the vehicle. When Lt. Marotz asked if the men were okay, they explained they were brothers who "had gotten into an argument[,]" but "that everything was okay now." Based on this answer, Lt. Marotz drove away, but parked at a nearby gas station, and continued watching the vehicle because he felt that something was not right, and wanted "to make sure that they didn't continue to argue[.]" The vehicle remained stationary, which Lt. Marotz thought was "odd[,]" so he decided to speak with them again. He left his patrol car, and walked over to the stationary vehicle.
As he approached, unusual events continued. Defendant got out of the backseat and stood in the middle of the road, and the driver immediately pulled the car forward two feet, then stopped. Lt. Marotz called out to the driver to inquire whether he was just going to leave his brother in the middle of the road, which notably was in the dark at 4 a.m., and no other people were present. The driver claimed he was late for work. In an eerie exchange, Lt. Marotz again asked if everything was okay, and although the men initially confirmed everything was okay, Lt. Marotz asked a second time, and the driver shook his head "no" while saying yes.
When Lt. Marotz told Defendant that the driver had indicated "no," the driver interrupted Lt. Marotz to say everything was fine, appearing "hurried[,]" "edg[ing] the vehicle forward[.]" Lt. Marotz told the driver to go to work, and the driver left. Defendant remained, just standing in the middle of the road. He then stated he was going to the *360 store, which was closed.[22] Lt. Marotz testified that, in response, he told Defendant to "[h]ang on a minute[,]" which he testified was a command, and the point at which Defendant was seized.
In my review, there were objective facts related to the driver's fear and unease, including that he notified Lt. Marotz that he was not okay, while eager to leave Defendant behind. This fear was observed after Defendant had pulled a toboggan over his face as if it were a mask, which *683 are routinely used in crimes.[23] Defendant was then left in the middle of the road at 4 a.m., claiming he was going to a closed store. The totality of these circumstances leading up to this seizure demonstrate there was a reasonably articulable suspicion that criminal activity was afoot when Lt. Marotz seized Defendant and discovered his name and identity. Thus, the Fourth Amendment permitted Lt. Marotz to briefly stop Defendant in an attempt to dispel the suspicion. See Adams , 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed. 2d at 617 ("A brief stop of a suspicious individual, in order to ... maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."). Lt. Marotz rightly ended the encounter once he found no further signs that criminal activity was afoot.

I assume, without deciding, that this was the point at which the seizure occurred for the reasons articulated by the Majority.

Although Lt. Marotz subjectively did not know the store was closed at this point, review of Lt. Marotz's bodycam shows a closed store, and, when two other officers appeared on scene, they were able to observe that the store was closed, as one of the officers told Lt. Marotz it was closed.

"Toboggan" refers to a "stocking cap." In re N.J. , No. COA13-53, 230 N.C. App. 140, 752 S.E.2d 255, 2013 WL 5460091 *1, fn. 2 (N.C. Ct. App. October 1, 2013) (unpublished) (citing Merriam-Webster's Collegiate Dictionary 1313 (11th ed. 2004)).
Our case law demonstrates many crimes are committed while a ski mask is used. See e.g. State v. Hall , 165 N.C. App. 658, 664, 599 S.E.2d 104, 107 (2004) ("The robber wore a ski mask[.]"); State v. Bellamy , 172 N.C. App. 649, 654, 617 S.E.2d 81, 86 (2005) ("[The robber] wore a green ski mask[.]"); State v. Taylor , 80 N.C. App. 500, 502, 342 S.E.2d 539, 540 (1986) ("[The robber] was wearing the ski mask.").
Even if the mask were a toboggan without eye holes, our review is based on the facts available to Lt. Marotz at the time, who could not definitively tell whether there were eye holes, but thought it looked like a mask with cutouts. Moreover, toboggan-style masks are also used to further crime. See e.g. State v. Hagans , 177 N.C. App. 17, 18, 628 S.E.2d 776, 778 (2006) ("[The] assailants were ... dressed in ... toboggan masks with the areas over the eyes cut out."); State v. Ford , 194 N.C. App. 468, 470, 669 S.E.2d 832, 835 (2008) ("[They wore] toboggans over their faces...."); State v. Stephens , 175 N.C. App. 328, 331, 623 S.E.2d 610, 612 (2006) (describing how "[a]nother man wearing ... a black toboggan over his head and face, with home made eye holes cut into it" participated in the robbery).