IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA17-28

 Filed: 19 September 2017

Forsyth County, No. 15 CRS 061796

STATE OF NORTH CAROLINA

 v.

AHMAD JAMIL NICHOLSON, Defendant.

 Appeal by Defendant from judgment entered 13 May 2016 by Judge John O.

Craig, III in Forsyth County Superior Court. Heard in the Court of Appeals 9 August

2017.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General John R.
 Green, Jr., for the State.

 Patterson Harkavy LLP, by Narendra K. Ghosh, for defendant-appellant.

 HUNTER, JR., Robert N., Judge.

 On 4 May 2016, Ahmad Jamil Nicholson (“Defendant”) filed a motion to

suppress evidence obtained by law enforcement officers following a traffic stop. On 9

May 2016, the trial court orally denied Defendant’s motion to suppress. 1 Defendant

appeals following a 12 May 2016 verdict convicting him of common law robbery. On

 1We note, the trial court suggested a written order would be prepared by Mr. Matthew H.
Breeding, counsel for the State, but no written order is included in the record.
 STATE V. NICHOLSON

 Opinion of the Court

appeal, Defendant contends the trial court erred by denying his motion to suppress

evidence. We find prejudicial error and grant a new trial for Defendant.

 I. Factual and Procedural History

 On 14 March 2016, a Forsyth County Grand Jury indicted Defendant for

robbery with a dangerous weapon. On 4 May 2016, Defendant filed a written, verified

motion to suppress “any and all statements obtained from the defendant” while he

was “seized” on the morning of 23 December 2015. On 9 May 2016, the Forsyth

County Superior Court called Defendant’s case for trial. After addressing other

pretrial motions (not in contention on appeal), the trial court heard Defendant’s

motion to suppress.

 In opposition to the motion, the State called Lieutenant Damien Marotz, the

arresting officer. Around 4:00 a.m., on 23 December 2015, Lt. Marotz drove west

down West Mountain Street in Kernersville, North Carolina. As he approached the

intersection of West Mountain Street and West Bodenhamer Street, he noticed a car

parked in the road, facing east, just past the Petro 66 gas station. “It was just sitting

there in the turn lane, with its headlights on and no turn signals . . . .” There were

no reports of criminal activity in the area that morning.2

 As Lt. Marotz drove towards the stationary car, he saw two African American

men inside the car; one man sat in the driver’s seat, and the other passenger sat

 2
 Lt. Marotz did not specify how he knew there were no reports of criminal activity, but testified
there were no reports and confirmed he was conducting a “routine” patrol.

 -2-
 STATE V. NICHOLSON

 Opinion of the Court

directly behind the driver, with the front passenger seat empty. Lt. Marotz later

identified the passenger as Defendant. Although it was “in the 40s” and “misting

rain[,]” both windows on the driver’s side of the car were down. Defendant began to

pull down “a toboggan-style mask of some kind” to approximately “the bridge of [his]

nose[,]” but “pushed it back up” as Lt. Marotz pulled up next to the car. However, Lt.

Marotz did not know if the garment actually had eyeholes.

 Lt. Marotz rolled his window down and asked both men if everything was okay.

Both men confirmed everything was okay, and the driver, Quentin Chavis, explained

“[Defendant] was his brother and . . . they had gotten into an argument and that

everything was okay now, that they were not arguing anymore.” Defendant agreed,

stating, “Yes, Officer, everything’s fine.”

 Lt. Marotz “did not observe a sign of struggle” between the men. However,

“something just didn’t seem quite right.” He asked, again, if the men were sure

everything was okay. Both men “[shook] their head[s] and agree[d]” everything was

okay. Lt. Marotz noticed Chavis “move[ ] his hand up . . . scratching” or “making a

motion with his hand[.]” Lt. Marotz specifically recalled this action because he “kept

watching everybody’s hands to make sure they didn’t have any weapons.” Lt. Marotz

inquired, again, if they needed any help, and the men continued to confirm

“everything was fine.”

 -3-
 STATE V. NICHOLSON

 Opinion of the Court

 Lt. Marotz drove into the gas station parking lot. He decided to continue

watching the car because he “felt like something wasn’t quite right” and he “wanted

to make sure that they didn’t continue to argue[.]” Approximately thirty seconds

elapsed, and the car did not move. Lt. Marotz decided to speak with the men again

and got out of his car to walk over to them. Lt. Marotz “thought it was odd that they

were just still sitting in the middle of the road.” Lt. Marotz activated his body-worn

camera3 and called for backup.

 As Lt. Marotz walked towards the car, Defendant got out of the backseat.

Chavis pulled the car forward approximately two feet and stopped. Lt. Marotz called

out to Chavis, “Hey. Where are you going? Are you going to leave your brother just

out here?” Chavis replied he was late and needed to get to work.

 Again, Lt. Marotz inquired if everything was okay. Initially, both men

continued to confirm everything was okay. However, the second time Lt. Marotz

inquired, Chavis shook his head, as if to indicate “No.” But Defendant continued to

say, “No, Officer. Everything is fine.” Lt. Marotz responded, “Well, your brother here

in the driver’s seat is shaking his head. He’s telling me everything’s not fine. Is

everything fine or not? Is everything good?” Chavis interrupted Lt. Marotz and

stated, “No, Officer, everything’s fine. I’ve just got to get to work.” Chavis explained

he worked at FedEx. Lt. Marotz described Chavis as “hurried” and “just ready to

 3 Lt. Marotz’s body-worn camera did not activate the first time he attempted to turn it on. He
had to hit it two additional times before it activated.

 -4-
 STATE V. NICHOLSON

 Opinion of the Court

go[,]” noting he “edged the vehicle forward a couple of feet[.]” After Defendant

confirmed again everything was okay, Lt. Marotz told the driver, “Okay. Go to work.”

Lt. Marotz explained “if I wanted to continue the investigation, I could have went [to

FedEx]” to speak with Chavis. However, Lt. Marotz did not know the identity of the

driver at this time.

 Defendant continued to “st[and] there[,]” but stated he was going to go to the

store. Lt. Marotz responded, “Hang on a minute . . . . Do you have any weapons on

you?” Lt. Marotz confirmed this was a command, and Defendant was thereafter

“detained.” He wanted to make sure he was not being followed “with any sort of

weapon” and it was not unusual for him to ask such a question, given the darkness

and early morning hour. Defendant told Lt. Marotz he had a knife. Defendant

explained “he normally carries a knife because he wants to make sure he doesn’t get

robbed.” Lt. Marotz asked Defendant where the knife was, but advised him not to

reach for it. Despite Lt. Marotz’s instruction, Defendant moved “his hand into his left

pants pocket.” At that point, Lt. Marotz drew his firearm, but kept it lowered by his

side.

 Officers Oriana and Feldman arrived on the scene. Defendant removed his

hand from his pocket and stated, “Just don’t shoot me.” Lt. Marotz asked Defendant

several times to put his hands on his head and to step out of the road to avoid

approaching traffic before he complied. Defendant appeared confused and

 -5-
 STATE V. NICHOLSON

 Opinion of the Court

“slow . . . to listen to . . . instructions and . . . commands.” Defendant asked several

times, “What am I doing?” Defendant also had “a moderate odor of alcohol on his

person, and his speech was slurred.”

 One of the backup officers asked Defendant where the knife was. Defendant

responded, “It’s in my waistband” and began to reach for it. Lt. Marotz and the

backup officers told Defendant to put his hands back on top of his head. Defendant

complied. Officer Feldman performed a pat-down, but he could not locate a knife.

Throughout the process, Defendant attempted to lower his hands repeatedly, and

officers advised him multiple times to keep his hands on the top of his head. Officer

Feldman performed a second pat-down, but he still could not find a knife on

Defendant. Lt. Marotz told Defendant they could not locate a knife. Defendant

replied, “he didn’t have the knife on him, that he used to carry this knife but that

sometimes he carries a knife.”

 Then, Lt. Marotz asked Defendant for his identification.4 Officer Feldman

provided Defendant’s information over the radio. Lt. Marotz continued to question

Defendant about “what was going on with him and his brother” because he “wanted

to make sure that there wasn’t any problems and that he wasn’t injured, [and] his

 4 Based on Lt. Marotz’s testimony during the motion to suppress hearing, we are unable to
ascertain exactly how Defendant’s identification was produced. Lt. Marotz’s testimony during trial
provided further clarification. It appears Officer Feldman removed Defendant’s wallet from
Defendant’s pocket and Defendant “reached over and grabbed the ID -- or the wallet out of the officer’s
hand and says, ‘I can give you my ID.’”

 -6-
 STATE V. NICHOLSON

 Opinion of the Court

brother wasn’t injured . . . because something did not seem quite right.” When asked

why he continued to question Defendant when “[he] had no evidence of any criminal

activity that [he] was able to objectively point to[,]” Lt. Marotz answered he “wanted

to make sure that both [Defendant] and also [Chavis] were safe and that nothing had

happened to either one of them.”

 Officer Oriana also asked Defendant where he lived. Defendant did not answer

the question and instead asked several times whether Officer Oriana was going to

give him a ride home. Defendant became “angry” and “aggressive.” Lt. Marotz

instructed Officer Oriana not to give Defendant a ride home because Defendant

appeared to be “impaired.”

 Defendant also made several other statements, including he was late for work

and his brother had let him borrow the car so he could go to work. However,

Defendant refused to say where he worked, and Defendant’s statement regarding

borrowing the car “didn’t make any sense because [Chavis] was driving the vehicle.”

 After determining there were no active warrants against Defendant, Lt.

Marotz told Defendant, “You’re free to go.” Defendant told officers he was going to

the store. However, he remained with Lt. Marotz and the two officers for

approximately another thirty seconds. He asked for a cigarette and a lighter, but

they did not have any. Defendant started heading towards the store, but one of the

officers informed Lt. Marotz the store was closed. Lt. Marotz called out to Defendant,

 -7-
 STATE V. NICHOLSON

 Opinion of the Court

“I’m sorry, sir. I didn’t realize the store is closed.” The entire encounter lasted

approximately eight to ten minutes.

 Lt. Marotz confirmed his body-worn camera recorded the entire encounter, and

the video footage “fairly and accurately” depicted the interaction. The defense

“stipulate[d] for [the] hearing [the video was] admissible to play.” The trial court

viewed the video.

 Following arguments from the defense, the trial court denied Defendant’s

motion to suppress. The trial court reconvened on 10 May 2016 and proceeded to

trial.

 The State first called Chavis to testify.5 On 23 December 2015, at around 3:00

a.m., Chavis woke up for work. Around 3:40 a.m., he drove out of his parents’

neighborhood, towards the intersection of Westlo Drive and Mountain Street. There,

he saw Defendant waving at him. Chavis did not know Defendant. However, he

stopped because he thought Defendant might need help. Defendant asked for a ride

to a nearby gas station. Chavis told Defendant he could not give him a ride because

he was going to be late for work. Defendant then asked for a “blunt[,]” and Chavis

told him he did not have one. When Defendant again asked for a ride, Chavis again

refused.

 5
 The State also called the following witnesses: (1) Bobby Chavis, Quentin Chavis’s father; (2)
Sergeant Dan Wemyss, who administered the photographic lineup; and (3) Detective Alan Cox, who
interviewed Quentin Chavis.

 -8-
 STATE V. NICHOLSON

 Opinion of the Court

 Then, Defendant “just got in the car” and said, “I’ll just sit in the back.” Chavis

decided to give Defendant a ride to the gas station because he believed “[Defendant

was] not going to get out because he really need[ed] a ride” and “it was raining . . . .”

Defendant told Chavis, “I see you’re living good” and he liked his shoes that were in

a bag. Defendant explained that his phone died and he just needed a ride.

 The two arrived “in front of the Petro 66 gas station[.]” Chavis said, “Here you

go, man. Can you just get out because I’m late for work.” At that point, Defendant

placed a knife against Chavis’s neck and said, “Well, let’s just make this easy. Give

me everything you have, any money you have.” Chavis told Defendant he did not

have any cash. Defendant ordered Chavis to give him his credit card. Chavis gave

Defendant his State Employees’ Credit Union savings card. Defendant asked for

Chavis’s pin number, and Chavis told him a fake number. Defendant then said he

would not be able to remember the number and told Chavis to write it down.

Defendant rummaged through the middle console and found a pen and paper to write

on. Defendant wrote the pin down.6 Defendant leaned forward and warned Chavis

not to cancel the card. Chavis confirmed he would not. During this time, Chavis felt

“nervous and scared[,]” but explained he “was always taught” not to show any fear

“because when you show fear, that’s when -- that’s when it makes it easier for the

person.”

 6 In his initial testimony and his written statement to police, Chavis said he wrote the pin
down, not Defendant.

 -9-
 STATE V. NICHOLSON

 Opinion of the Court

 Defendant moved the knife “as if he was going to stab [Chavis.]” Defendant

said, “he had nothing to lose” and he “didn’t have a problem sticking [Chavis.]” At

that point, Chavis noticed a car approaching. Defendant “tried to pull his toboggan

over his face[.]” Lt. Marotz pulled up beside the car in the opposite lane. Chavis

spoke with Lt. Marotz, but he did not tell the officer what was going on because he

“didn’t know what the defendant was going to do[,]” or whether “he still had a knife

on him[,]” and “[t]here was only one officer.”7 However, Chavis attempted to signal

to Lt. Marotz “to show him that everything wasn’t okay” by “winking real hard . . . to

see if he could identify I was trying to wink at him on purpose[.]” He also made a “cut

throat” gesture.

 Chavis called his mother and told her and his father about the incident. Then

he went to work, arriving at around 4:15 a.m. Chavis returned home around 6:30

a.m. and then went to the police station with his father.

 Upon arriving at the police station at approximately 7:00 or 7:15 a.m., Chavis

conveyed the same story and provided a written statement. Chavis identified

Defendant as the person who robbed him, from a photographic lineup8 containing

 7 Chavis testified, “[Defendant] still had the knife to my neck.” We note, although Lt. Marotz

testified he was trying to keep an eye on everyone’s hands, he could not actually see Defendant’s hands,
and only knew they were down, and he did not see a knife. He did note, “It was dark out.”
 8 Chavis also identified Defendant as the man who robbed him during his testimony.

 - 10 -
 STATE V. NICHOLSON

 Opinion of the Court

seven9 photos.10 An officer searched Chavis’s car and found a knife 11in the backseat,

behind the passenger seat.12 After returning home, Chavis began to clean out his car

and found his bank card in an “envelope that [ ] had [his] pay stub from Fedex[.]”13

Chavis called police to notify them “[Defendant] didn’t take the card. He just left the

card.”

 Lt. Marotz also testified, providing largely the same information regarding his

encounter with Defendant as he did during the motion to suppress hearing.14 The

State published the footage from Lt. Marotz’s body-worn camera to the jury.

 The State called Officer Serrin. Officer Serrin largely confirmed Chavis’s

testimony regarding their interaction at the police station. He provided additional

details regarding the knife he seized from Chavis’s car, describing it as a “steak

 9 Chavis’s testimony conflicts with Officer J.D. Serrin’s as to whether there were seven or eight
photos in the lineup.
 10 Chavis first chose the first photo, but considered the sixth photo. After determining the man

in the sixth photo was too large to be his robber, he ultimately chose the first photo, Defendant’s photo.
 11 The trial court admitted the knife into evidence, and it was shown to the jury.
 12 Chavis rode to the police station with his father, in his father’s car. Initially, the officer told

Chavis he would go to Chavis’s house to search Chavis’s car. However, officers later instructed Chavis
to return to the police station. He returned to the station with his car around 8:00 a.m., approximately
thirty minutes after he originally left.
 13 Chavis explained he keeps his old pay stubs in his car, and the pay stub in the envelope in

his card “was an older pay stub.”
 14 Defendant requested a line objection with respect to evidence obtained from the encounter

with Defendant after Lt. Marotz “seized” him, thus preserving the issue of admissibility for appeal.
State v. Randolph, 224 N.C. App. 521, 528, 735 S.E.2d 845, 851 (2012) (quoting State v. Oglesby, 361
N.C. 550, 554, 648 S.E.2d 819, 821 (2007)) (“[A] trial court’s evidentiary ruling on a pretrial motion is
not sufficient to preserve the issue of admissibility for appeal unless a defendant renews the objection
during trial.”).

 - 11 -
 STATE V. NICHOLSON

 Opinion of the Court

knife.” He specifically recalled, “It had a logo on it, the J. A. Henckels logo on it. I

recognized it because that’s the same brand of knife that I have.”

 After obtaining a warrant for Defendant’s arrest, Officer Serrin and several

other officers went to Defendant’s home and obtained permission to search the

home.15 Officer Serrin found a J.A. Henckels knife block in the kitchen.16 “[T]he

block [had] two sections. It had one section for steak knives, and above that was a

section for other cooking knives.” A single steak knife was missing. “[He] pulled out

one of the steak knives out of the block, and it looked identical to the knife [he] found

in [Chavis’s] car.” When asked, Officer Serrin admitted the knife seized from Chavis’s

car looked much older than the pictures of the knives in the block, but believed “the

latent print dust” contributed to this appearance. He did not seize the knife block

because “it wasn’t evidence of a crime. It was what [he] compared evidence to.” The

State published pictures of the knife set to the jury.

 The State rested.17 Defendant offered no evidence on his behalf. On 12 May

2016, the jury found Defendant guilty of common law robbery. The trial court

 15 Defendant’s mother, and owner of the home, gave consent.
 16 Defendant moved in limine to “prohibit[ ] the State or any of its witnesses, from stating in
the presence of the jury any information relating to an allegedly matching set of steak knives missing
one which matched the knife recovered from the back of the complaining witness’ car” because police
failed to seize the set of knives. The court denied Defendant’s motion, and Defendant does not raise
this issue on appeal. Because this issue is not raised on appeal, we do not address it. N.C. R. App. P.
28(a) (2016) (“The scope of review on appeal is limited to issues so presented in the several briefs.
Issues not presented and discussed in a party’s brief are deemed abandoned.”).
 17 As noted supra in footnote 5, the State called several other witnesses whose testimonies are

not included in this discussion.

 - 12 -
 STATE V. NICHOLSON

 Opinion of the Court

sentenced Defendant to a suspended sentence of ten to twenty-one months. On 13

May 2016, Defendant gave timely oral and written notice of appeal.

 II. Standard of Review

 Our review of a trial court’s denial of a motion to suppress is “strictly limited

to determining whether the trial judge’s underlying findings of fact are supported by

competent evidence, in which event they are conclusively binding on appeal, and

whether those factual findings in turn support the judge’s ultimate conclusions of

law.” State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982) (citations omitted).

“The trial court’s conclusions of law . . . are fully reviewable on appeal.” State v.

Hughes, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

 “[A]n error under the United States Constitution will be held harmless if ‘the

jury verdict would have been the same absent the error.’” State v. Lawrence, 365 N.C.

506, 513, 723 S.E.2d 326, 331 (2012) (quoting Neder v. United States, 527 U.S. 1, 17,

144 L. Ed. 2d 35, 52 (1999)). “[T]he government bears the burden of showing that no

prejudice resulted from the challenged federal constitutional error.” Id. at 513, 723

S.E.2d at 331 (citations omitted).

 III. Analysis

 We review Defendant’s contentions in two parts: (A) whether Lt. Marotz

possessed reasonable suspicion to seize Defendant; and (B) whether the trial court’s

denial of Defendant’s motion to suppress resulted in reversible error.

 - 13 -
 STATE V. NICHOLSON

 Opinion of the Court

A. Reasonable Suspicion

 On appeal, Defendant contends the trial court erred in denying his motion to

suppress. Specifically, Defendant argues Lt. Marotz lacked reasonable suspicion,

and, accordingly, Defendant was “seized” in violation of his Fourth Amendment

rights. We agree.

 The Fourth Amendment protects “against unreasonable searches and

seizures . . . .” U.S. Const. amend. IV. Fourth Amendment protections are

“applicable to the states through the Due Process Clause of the Fourteenth

Amendment.” State v. Watkins, 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994) (citing

Mapp v. Ohio, 367 U.S. 643, 655, 6 L. Ed. 2d 1081, 1090 (1961)). The North Carolina

Constitution also affords individuals similar protections. State v. Barnard, 362 N.C.

244, 246, 658 S.E.2d 643, 645 (2008) (citing N.C. Const. art. I, § 20).

 Under the Fourth Amendment, a “seizure” occurs when a police officer

“restrains [an individual’s] freedom to walk away[.]” Terry v. Ohio, 392 U.S. 1, 16, 20

L. Ed. 2d 889, 903 (1968). Thus, Fourth Amendment protections are applicable to

“police conduct [even] if the officers stop short of . . . a ‘technical arrest[.]’” Id. at 19,

20 L. Ed. 2d at 904; Watkins, 337 N.C. at 441, 446 S.E.2d at 69-70 (applying Fourth

Amendment protections to a “brief” investigatory detention).

 “An investigatory stop must be justified by ‘a reasonable suspicion, based on

objective facts, that the individual is involved in criminal activity.’” Watkins, 337

 - 14 -
 STATE V. NICHOLSON

 Opinion of the Court

N.C. at 441, 446 S.E.2d at 70 (quoting Brown v. Texas, 443 U.S. 47, 51, 61 L. Ed. 2d

357, 362 (1979)). “[D]ue weight must be given not to [an officer’s] inchoate and

unparticularized suspicion or ‘hunch.’” Terry, 392 U.S. at 27, 20 L. Ed. 2d at 909

(citation omitted). Rather, reasonable suspicion must be based on “rational

inferences” drawn from “specific and articulable facts . . . as viewed through the eyes

of a reasonable, cautious officer, guided by his experience and training.” Watkins,

337 N.C. at 441, 446 S.E.2d at 70 (citing Terry, 392 U.S. at 21-22, 20 L. Ed. 2d at 906;

State v. Thompson, 296 N.C. 703, 706, 252 S.E.2d 776, 779, cert. denied, 444 U.S. 907,

62 L. Ed. 2d 143 (1979)). “[T]he totality of the circumstancesthe whole picturemust

be taken into account.” United States v. Cortez, 449 U.S. 411, 417, 66 L. Ed. 2d 621,

629 (1981). “[W]holly lawful conduct [may in certain circumstances] justify the

suspicion that criminal activity was afoot.” United States v. Sokolow, 490 U.S. 1, 9

104 L. Ed. 2d 1, 11-12 (1989) (citation omitted).

 “In applying this test we have consistently eschewed bright-line rules, instead

emphasizing the fact-specific nature of the reasonableness inquiry.” Ohio v.

Robinette, 519 U.S. 33, 39, 136 L. Ed. 2d 347, 354 (1996). However, “courts have

recognized factors such as activity at an ‘unusual hour[,]’ and ‘an area’s disposition

toward criminal activity’ as articulable circumstances which may be considered along

with more particularized factors to support reasonable suspicion[.]” State v. Parker,

137 N.C. App. 590, 601, 530 S.E.2d 297, 304 (2000) (citations omitted). “Conflicting

 - 15 -
 STATE V. NICHOLSON

 Opinion of the Court

statements”, State v. Johnson, ___ N.C. App. ___, ___, 783 S.E.2d 758, 762-63 (2016)

(citing State v. Hernandez, 170 N.C. App. 299, 308, 612 S.E.2d 420, 426 (2005)), as

well as a vehicle “stopped in a lane of traffic on the road way” have also provided basis

for reasonable suspicion. State v. Evans, ___ N.C. App. ___, ___, 795 S.E.2d 444, 454-

56 (2017) (holding reasonable suspicion supported by: “(1) defendant[’s vehicle]

stopped . . . in a lane of traffic on the roadway; (2) . . . an unknown pedestrian

approach[ing] the car and lean[ing] in the window; and (3) th[e] incident occur[ing]

at 4:00 a.m. in an area known . . . to be a location where drug sales frequently took

place”).18

 At the outset we note, the trial court denied Defendant’s motion to suppress

orally.

 If the trial court provides the rationale for its ruling from
 the bench and there are no material conflicts in the
 evidence, the court is not required to enter a written order.
 If these two criteria are met, the necessary findings of fact
 are implied from the denial of the motion to suppress. If

 18
 We note both the State and Defendant cite State v. Roberts, 142 N.C. App. 424, 542 S.E.2d
703 (2001). However, Roberts is no longer binding precedent. The North Carolina Supreme Court
allowed the Attorney General’s motion “to vacate judgment of Court of Appeals[.]” State v. Roberts,
353 N.C. 733, 551 S.E.2d 851 (2001). Defendant argues because the Supreme Court only vacated the
judgment, not the opinion, Roberts is still binding precedent. Our research shows Roberts passed away
while imprisoned on 10 January 2001. See North Carolina Department of Public Safety Offender
Public Information,
(http://webapps6.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0346619&searchLas
tName=roberts&searchFirstName=James&searchMiddleName=d&listurl=pagelistoffendersearchres
ults&listpage=1) (last visited August 9, 2017). “Under North Carolina Rule of Evidence 201, we take
judicial notice of this fact from the Department of Public Safety website’s offender search results.”
State v. Harwood, ___ N.C. App. ___, ___ n.2, 777 S.E.2d 116, 118 (2015) (citations omitted). Because
Roberts passed away before this Court filed its opinion, and thus before his conviction was final, the
entire prosecution is abated ab initio. See State v. Dixon, 265 N.C. 561, 561-62, 144 S.E.2d 622, 622-
23 (1965).

 - 16 -
 STATE V. NICHOLSON

 Opinion of the Court

 there is not a material conflict in the evidence, it is not
 reversible error to fail to make such findings because we
 can determine the propriety of the ruling on the undisputed
 facts which the evidence shows.

State v. Wainwright, 240 N.C. App. 77, 83, 770 S.E.2d 99, 104 (2015) (internal

citations and quotation marks omitted).

 For the motion to suppress, only Lt. Marotz testified. Defendant declined the

opportunity to present any evidence. Additionally, Defendant does not argue any

material conflicts with Lt. Marotz’s testimony. Thus, “[t]he record is sufficient to

permit appellate review of the [oral] denial of [D]efendant’s motion to suppress.” Id.

at 83, 770 S.E.2d at 104.

 Defendant does not challenge the constitutionality of his initial interaction

with Lt. Marotz, but rather the point at which Lt. Marotz stopped Defendant from

going to the store. Lt. Marotz acknowledged Defendant was from that point forward,

“detained,” and the State does not contest this on appeal.19 We therefore assume,

without deciding, Defendant was from that point forward “seized” until Lt. Marotz

told him he was free to leave.

 We turn to whether Lt. Marotz possessed reasonable suspicion to seize

Defendant. We begin with Lt. Marotz’s cross examination:

 Q. And you, at that point, had no evidence of any criminal
 activity that you were able to objectively point to. Correct?

 19 The State does note in passing, perhaps it was not a “seizure” because Defendant remained
with police even after he was told he was free to leave.

 - 17 -
 STATE V. NICHOLSON

 Opinion of the Court

 A. No. That’s why I was continuing to investigate.

 Q. So you were looking to see if you could find anything,
 but you hadn’t yet seen anything?

 A. That’s correct. I wanted to make sure that both your
 client and also the alleged victim were safe and that
 nothing had happened to either one of them.

 State v. Murray, 192 N.C. App. 684, 666 S.E.2d 205 (2008) provides relevant

guidance. In Murray, the law enforcement officer similarly testified, “he had no

reason to believe that Defendant was engaged in any unlawful activity at the time of

the stop.” Id. at 684, 666 S.E.2d at 206. Despite the reference to facts that “were

general to the area, namely, the ‘break-ins of property at Motorsports Industrial

Park . . . the businesses were closed . . . no residences were located there . . . [and it]

was in the early hours of the morning,’” this Court concluded the officer did not have

a basis for reasonable suspicion. Id. at 689, 666 S.E.2d at 208-09. The Court

reasoned, “[the officer] never articulated any specific facts about the vehicle itself to

justify the stop . . . ” and “[t]o hold otherwise would make any individual in the

Motorsports Industrial Park ‘subject to arbitrary invasions solely at the unfettered

discretion of officers in the field.’” Id. at 689-90, 666 S.E.2d at 208-09 (emphasis

added) (citation omitted).

 Here, Lt. Marotz similarly confirmed he had no evidence of any criminal

activity to which he could objectively point. However, unlike Murray which relied

solely on facts “general to the area,” Lt. Marotz pointed to Defendant’s toboggan,

 - 18 -
 STATE V. NICHOLSON

 Opinion of the Court

stating, “[t]he only thing I saw with [Defendant] was the -- what I was concerned

about was the -- when he was pulling the toboggan down over his head. I wasn’t sure

exactly what was going on at that point.” Notably, although Lt. Marotz initially

suggested the garment appeared to be “a toboggan-style mask . . . the [kind] with the

holes in the eyes[,]” Lt. Marotz confirmed he did not know whether the toboggan

actually had any eyeholes.

 The State points to several factors in support of its argument for reasonable

suspicion, including: (1) the unoccupied front passenger seatdespite there being two

occupants in the carwith Defendant seated in the backseat, directly behind Chavis;

(2) the car’s stationary position “in the middle of the road”; (3) Lt. Marotz’s knowledge

that Defendant and Chavis had just been engaged in “a heated argument”; (4) the

inconsistent answers provided by Chavis when asked whether everything was okay;

and (5) the early morning hour. However, unlike the “totality of the circumstances”

present in Evans, the circumstances present here do not logically lead to the same

conclusions. See Evans, ___ N.C. App. at ___, 795 S.E.2d at 454-56. This is especially

true in light of the fact Lt. Marotz already questioned both Defendant and Chavis

twice and subsequently released Chavis so he could go to work after he assessed the

situation and concluded “[i]t was a heated argument between two brothers.”

 Moreover, when asked why he seized Defendant and inquired whether

Defendant was armed, Lt. Marotz stated, “Well, it’s just a common thing that I ask

 - 19 -
 STATE V. NICHOLSON

 Opinion of the Court

everybody that’s out at 4:00 A.M. in the morning, in the dark. And if you’re -- I just

want to make sure that if I’m coming out with you, you don’t -- you’re not following

me with any sort of weapon.” Such basis for a “seizure” would have made “any

individual in the [area] subject to arbitrary invasions” as was contemplated in

Murray. Murray, 192 N.C. App. at 689-90, 666 S.E.2d at 208-09 (emphasis added)

(citation and quotation marks omitted).

 “‘[A] series of acts, each of them perhaps innocent’ if viewed separately, ‘but

which taken together’” can in certain circumstances “warrant[ ] further

investigation.” Sokolow, 490 U.S. at 10, 104 L. Ed. 2d at 12 (citation and quotation

marks omitted). However, the acts present here, when taken together do not provide

a basis for reasonable suspicion. Accordingly, we conclude Lt. Marotz lacked

reasonable suspicion to stop Defendant, and the trial court erred in denying

Defendant’s motion to suppress.

B. Prejudicial Error

 Defendant also contends the trial court’s denial of his motion to suppress

resulted in reversible error. We agree.

 Some constitutional errors in the setting of a particular
 case are so unimportant and insignificant that they may,
 consistent with the Federal Constitution, be deemed
 harmless, not requiring the automatic reversal of the
 conviction . . . . [B]efore a federal constitutional error can
 be held harmless, the court must be able to declare a belief
 that it was harmless beyond a reasonable doubt. In
 deciding what constituted harmless error . . . the [United

 - 20 -
 STATE V. NICHOLSON

 Opinion of the Court

 States Supreme] Court said: “The question is whether
 there is a reasonable possibility that the evidence
 complained of might have contributed to the conviction.”

State v. Johnson, 29 N.C. App. 534, 537-38, 225 S.E.2d 113, 115-16 (1976) (citation

and quotation marks omitted) (first alteration in original). If other “overwhelming

evidence” supports the conviction beyond a reasonable doubt, the erroneous

admission of the contested evidence is harmless error. State v. Johnston, 154 N.C.

App. 500, 503, 572 S.E.2d 438, 441 (2002) (citations omitted) (holding erroneous

admission of evidence was harmless due to the “overwhelming evidence of defendant’s

guilt” as established by the positive identification of defendant by various witnesses

and defendant’s presence at the crime scene). We must, therefore, determine whether

the evidence, excluding “any and all statements obtained from the defendant as a

result of the unlawful seizure and detention of the defendant[,]” supports Defendant’s

conviction of common law robbery. We note this only excludes the statements from

Defendant during the time Lt. Marotz stopped him from going to the store and when

officers conducted two pat-downs.

 “Common law robbery ‘is the felonious taking of money or goods of any value

from the person of another, or in his presence, against his will, by violence or putting

him in fear.’” State v. Carter, 186 N.C. App. 259, 262, 650 S.E.2d 650, 653 (2007)

(quoting State v. Stewart, 255 N.C. 571, 572, 122 S.E.2d 355, 356 (1961)). “‘It is not

necessary to prove both violence and putting in fearproof of either is sufficient.’” Id.

 - 21 -
 STATE V. NICHOLSON

 Opinion of the Court

at 262, 650 S.E.2d at 653 (quoting State v. Moore, 279 N.C. 455, 458, 183 S.E.2d 546,

547 (1971)).

 Here, much of the evidence used to support Defendant’s conviction was derived

from Lt. Marotz’s unconstitutional seizure; thus, it was fruit of the poisonous tree and

should be suppressed. Fourth Amendment protections are enforced through the

“exclusionary rule.” State v. McKinney, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006).

Under the exclusionary rule “evidence derived from an unconstitutional search or

seizure is generally inadmissible in a criminal prosecution of the individual subjected

to the constitutional violation.” Id. Additionally, the “fruit of the poisonous tree

doctrine,” provides “when evidence is obtained as the result of illegal police conduct,

not only should that evidence be suppressed, but all evidence that is the ‘fruit’ of that

unlawful conduct should be suppressed.” State v. Pope, 333 N.C. 106, 113-14, 423

S.E.2d 740, 744 (1992).

 Defendant’s conviction is supported by the following: (1) Chavis’s testimony

regarding the robbery; (2) Chavis’s positive identification of Defendant from a

photographic lineup; (3) Chavis identifying Defendant as the robber in court; (4) the

steak knife found in Chavis’s car; and (5) the block of knives found in Defendant’s

residence, missing one steak knife and bearing a striking resemblance to the steak

knife seized from Chavis’s car.

 - 22 -
 STATE V. NICHOLSON

 Opinion of the Court

 Had Lt. Marotz not seized Defendant, he would not have obtained Defendant’s

identification.20 Therefore Chavis’ subsequent identification of Defendant both in a

photograph line-up and in open court would not have occurred. Additionally, while

Defendant was unlawfully seized he disclosed his habit of often carrying a knife on

his person. This information led to the seizure of the knife from Chavis’s car, and the

subsequent search of Defendant’s home which revealed the block of knifes. Because

evidence that would not be discoverable but for the unconstitutional seizure must be

suppressed, McKinney, 361 N.C. at 58, 637 S.E.2d at 872, this evidence should have

been suppressed. We, therefore, conclude the evidence admitted from Defendant’s

unlawful seizure resulted in prejudicial error.

 IV. Conclusion

 For the foregoing reasons, we conclude Defendant’s seizure violated his Fourth

Amendment rights. Lt. Marotz lacked reasonable suspicion for the investigatory stop

of Defendant. Additionally, the trial court’s denial of Defendant’s motion to suppress

was prejudicial error entitling Defendant to a new trial.

 NEW TRIAL.

 Judge DAVIS concurs.

 Judge MURPHY dissents in a separate opinion.

 20The record does not suggest the State would have been able to independently link the
unknown suspect directly to Defendant, or obtain the evidence resulting from knowledge of
Defendant’s name.

 - 23 -
 No. COA17-28 – State v. Nicholson

 Murphy, Judge, dissenting.

 I accept the facts portion as set out by the Majority, however, the facts

demonstrate that there was a reasonably articulable suspicion that criminal activity

was afoot when Lt. Marotz seized Defendant. Therefore, I respectfully dissent from

the Majority’s holding that the trial court erred by denying Defendant’s motion to

suppress.

 On appeal, Defendant argues, and the Majority agrees, that the trial court

erred by denying Defendant’s motion to suppress because Lt. Marotz lacked the

reasonable suspicion that was required to stop Defendant. I disagree, because Lt.

Marotz operated within the bounds of the Fourth Amendment’s protections, only

seizing Defendant once there was a reasonably articulable suspicion that criminal

activity was afoot.

 In Terry v. Ohio, 392 U.S. 1, 20 L.Ed.2d 889 (1968), the United States Supreme

Court recognized that “a police officer may in appropriate circumstances and in an

appropriate manner approach a person for purposes of investigating possibly criminal

behavior even though there is no probable cause to make an arrest.” Id. at 22, 20

L.Ed.2d at 906-07. This is because “[t]he Fourth Amendment does not require a

policeman who lacks the precise level of information necessary for probable cause to

arrest to simply shrug his shoulders and allow a crime to occur or a criminal to

escape.” Adams v. Williams, 407 U.S. 143, 145, 32 L. Ed. 2d 612, 617 (1972). Thus,

“[a] brief stop of a suspicious individual . . . may be most reasonable in light of the
 STATE V. NICHOLSON

 Murphy, J., dissenting

facts known to the officer at the time” so that the officer can “maintain the status quo

momentarily” to gather more information. Id. at 146, 32 L. Ed. 2d at 617 (citations

omitted).

 We “consider the totality of the circumstances—the whole picture in

determining whether a reasonable suspicion to make an investigatory stop exists.”

State v. Watkins, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (quotation omitted). “An

investigatory stop must be justified by a reasonable suspicion, based on objective

facts, that the individual is involved in criminal activity.” Id. at 441, 446 S.E.2d at

70 (quotation omitted). These facts must be “specific and articulable[,]” and we also

consider “the rational inferences from those facts, as viewed through the eyes of a

reasonable, cautious officer, guided by his experience and training.” Id. at 441-42,

446 S.E.2d at 70 (citations omitted). Conduct may “justify the suspicion that criminal

activity was afoot[,]” even if, in other circumstances, the conduct would be “wholly

lawful.” United States v. Sokolow, 490 U.S. 1, 9, 104 L. Ed. 2d 1, 11 (1989) (quotation

omitted). For example, when an activity occurs “at an unusual hour” we have

considered it an articulable circumstance that may be considered “along with more

particularized factors to support reasonable suspicion[.]” State v. Parker, 137 N.C.

App. 590, 601, 530 S.E.2d 297, 304 (2000) (quotations and citations omitted).

 Whether the requisite reasonable suspicion to stop Defendant existed is a

conclusion of law. Thus, I apply the principles set forth above in a de novo

 2
 STATE V. NICHOLSON

 Murphy, J., dissenting

determination of whether reasonable suspicion to make an investigatory stop existed,

giving “due weight to inferences drawn from the facts by resident judges and local

law enforcement officers, and view[ing] the facts through the eyes of a reasonable,

cautious officer, guided by his experience and training, in light of the totality of the

circumstances.” Id. at 598, 530 S.E.2d at 302 (quotations and alterations omitted).

This analysis assumes the seizure occurred when Lt. Marotz stopped Defendant from

going to the store.21

 At the outset, I emphasize that the objective facts are viewed through the lens

of a reasonable, cautious officer, not based on Lt. Marotz’s subjective analysis of the

law. I note this point as the Majority places too much weight on Lt. Marotz’s analysis

on cross-examination as to whether there was evidence of criminal activity he could

point to at the time of seizure. In doing so, the Majority relies on a case where the

officer relied on a hunch and “never articulated any specific facts about the vehicle

itself to justify the stop . . . .” State v. Murray, 192 N.C. App. 684, 689, 666 S.E.2d

205, 208 (2008) (emphasis added). In contrast, Lt. Marotz articulated objective facts

about Defendant, from which a reasonable, cautious officer could infer that an

individual is involved in criminal activity.

 Lt. Marotz first noticed the vehicle from which Defendant emerged because it

was parked in the middle of a turning lane at an unusual hour – 4 a.m. – with

 21 I assume, without deciding, that this was the point at which the seizure occurred for the
reasons articulated by the Majority.

 3
 STATE V. NICHOLSON

 Murphy, J., dissenting

windows rolled down, even though there was “misting rain” and the temperature was

in the “40s.” He also noted the unusual seating arrangement of the vehicle’s two

passengers, where one man sat directly behind the driver, and was “concerned” when

Defendant pulled “a toboggan-style mask of some kind” – with what “looked like two

cutouts” – over his head to approximately “the bridge of [his] nose[,]” and then

removed it when Lt. Marotz pulled his patrol car up next to the vehicle. When Lt.

Marotz asked if the men were okay, they explained they were brothers who “had

gotten into an argument[,]” but “that everything was okay now.” Based on this

answer, Lt. Marotz drove away, but parked at a nearby gas station, and continued

watching the vehicle because he felt that something was not right, and wanted “to

make sure that they didn’t continue to argue[.]” The vehicle remained stationary,

which Lt. Marotz thought was “odd[,]” so he decided to speak with them again. He

left his patrol car, and walked over to the stationary vehicle.

 As he approached, unusual events continued. Defendant got out of the

backseat and stood in the middle of the road, and the driver immediately pulled the

car forward two feet, then stopped. Lt. Marotz called out to the driver to inquire

whether he was just going to leave his brother in the middle of the road, which notably

was in the dark at 4 a.m., and no other people were present. The driver claimed he

was late for work. In an eerie exchange, Lt. Marotz again asked if everything was

 4
 STATE V. NICHOLSON

 Murphy, J., dissenting

okay, and although the men initially confirmed everything was okay, Lt. Marotz

asked a second time, and the driver shook his head “no” while saying yes.

 When Lt. Marotz told Defendant that the driver had indicated “no,” the driver

interrupted Lt. Marotz to say everything was fine, appearing “hurried[,]” “edg[ing]

the vehicle forward[.]” Lt. Marotz told the driver to go to work, and the driver left.

Defendant remained, just standing in the middle of the road. He then stated he was

going to the store, which was closed.22 Lt. Marotz testified that, in response, he told

Defendant to “[h]ang on a minute[,]” which he testified was a command, and the point

at which Defendant was seized.

 In my review, there were objective facts related to the driver’s fear and unease,

including that he notified Lt. Marotz that he was not okay, while eager to leave

Defendant behind. This fear was observed after Defendant had pulled a toboggan

over his face as if it were a mask, which are routinely used in crimes. 23 Defendant

 22 Although Lt. Marotz subjectively did not know the store was closed at this point, review of
Lt. Marotz’s bodycam shows a closed store, and, when two other officers appeared on scene, they were
able to observe that the store was closed, as one of the officers told Lt. Marotz it was closed.

 23 “Toboggan” refers to a “stocking cap.” In re N.J., No. COA13-53, 230 N.C. App. 140, 752
S.E.2d 255, 2013 WL 5460091 *1, fn. 2 (N.C. Ct. App. October 1, 2013) (unpublished) (citing Merriam–
Webster’s Collegiate Dictionary 1313 (11th ed. 2004)).

 Our case law demonstrates many crimes are committed while a ski mask is used. See e.g. State
v. Hall, 165 N.C. App. 658, 664, 599 S.E.2d 104, 107 (2004) (“The robber wore a ski mask[.]”); State v.
Bellamy, 172 N.C. App. 649, 654, 617 S.E.2d 81, 86 (2005) (“[The robber] wore a green ski mask[.]”);
State v. Taylor, 80 N.C. App. 500, 502, 342 S.E.2d 539, 540 (1986) (“[The robber] was wearing the ski
mask.”).

 5
 STATE V. NICHOLSON

 Murphy, J., dissenting

was then left in the middle of the road at 4 a.m., claiming he was going to a closed

store. The totality of these circumstances leading up to this seizure demonstrate

there was a reasonably articulable suspicion that criminal activity was afoot when

Lt. Marotz seized Defendant and discovered his name and identity. Thus, the Fourth

Amendment permitted Lt. Marotz to briefly stop Defendant in an attempt to dispel

the suspicion. See Adams, 407 U.S. at 146, 32 L. Ed. 2d at 617 (“A brief stop of a

suspicious individual, in order to . . . maintain the status quo momentarily while

obtaining more information, may be most reasonable in light of the facts known to

the officer at the time.”). Lt. Marotz rightly ended the encounter once he found no

further signs that criminal activity was afoot.

 Even if the mask were a toboggan without eye holes, our review is based on the facts available
to Lt. Marotz at the time, who could not definitively tell whether there were eye holes, but thought it
looked like a mask with cutouts. Moreover, toboggan-style masks are also used to further crime. See
e.g. State v. Hagans, 177 N.C. App. 17, 18, 628 S.E.2d 776, 778 (2006) (“[The] assailants were . . .
dressed in . . . toboggan masks with the areas over the eyes cut out.”); State v. Ford, 194 N.C. App.
468, 470, 669 S.E.2d 832, 835 (2008) (“[They wore] toboggans over their faces. . . .”); State v. Stephens,
175 N.C. App. 328, 331, 623 S.E.2d 610, 612 (2006) (describing how “[a]nother man wearing . . . a black
toboggan over his head and face, with home made eye holes cut into it” participated in the robbery).

 6